## CIRCUIT COURT OF WARREN COUNTY

Commonwealth of Virginia,
*ex rel.* Virginia Waste Management Board
and the Executive Director
of the Department of Waste Management

v.

Lester R. Frame

August 6, 1986

Case No. (Chancery) H86005017

BY JUDGE HENRY H. WHITING

This matter is before the Court on an application for an injunction directing the defendant to close what the complainant describes as a solid waste disposal facility operated with a permit as required by the statute and the regulation. The evidence shows that the defendant has permitted the deposit of tree limbs, tree stumps and brush in a limestone quarry upon his property. The Court has heard the evidence of William F. Gilley, who is the Director of the Division of Solid Wastes of the State of Virginia, who has a master's degree in engineering specializing in public health, with extensive experience in environmental engineering. Both he and an earlier witness, Mr. Rexrode, a divisional manager for the State of Virginia, Department of Solid Waste, testified that brush and tree limbs concentrated in a dump without oxygen will decompose and leach out into the soil and through fissures in limestone, metals and organic material, including tannic acid, which will quickly flow from those quarries into underground wells, constituting a health hazard. Mr. Gilley also testified that their experience with such concentrations in at least once instance involved a massive infestation of cockroaches.

The defendant does not seriously contest the possible health hazard but relies principally upon a construction

of the statute and the regulations, which he says do not include such a facility as he has within their definition. Mr. Gilley testified that there were at least forty facilities in the State of Virginia which are permanent for such material and they are classified in the state as "stump dumps." Mr. Gilley admits that all of these applications were voluntary and this is the first time the state has ever been challenged in its contention that Section 10-264 covers this kind of operation. That section in pertinent part defines "solid waste" as "any garbage, refuse, sludge and other discarded material, including solid. . . material resulting from industrial, commercial, mining and agricultural operations and from community activities but does not include: (i) solid or dissolved material in domestic sewerage; (ii) solid or dissolved material in irrigation return flows or in industrial dischargers which are sources subject to a permit from the State Water Control Board; or (iii) source, special nuclear or by-product material as defined by the Federal Atomic Energy Act of 1954, as amended." The Commissioner-promulgated regulation pursuant to an earlier version of that statute defines:

(1) Solid waste as "garbage, refuse, and other discarded solid materials, including solid waste materials resulting from industrial, commercial, and agricultural operations, and from community activities";

(2) Agricultural waste as "solid waste resulting from the production of farm or agricultural products before processing";

(3) Commercial waste as "all solid waste emanating from establishments engaged in business. This category includes, but is not limited to, solid waste resulting from the operation of stores, markets, office buildings, restaurants, shopping centers, and theatres";

(4) Industrial waste as "all solid waste resulting form manufacturing and industrial processes such as, but not limited to, those carried on in factories, processing plants, refineries, slaughter houses, and steel mills"; and

(5) Institutional waste as "all solid waste emanating from institutions such as, but not limited to, hospitals, nursing homes, orphanages, schools, and universities, public or private."

The primary thrust of the defendant's argument is that the concededly general language in the beginning

portion of the statute has been limited by the reference to the specific sources of such refuse both in the statute and in the regulations. While he contends that his assertion is not an application of *ejusdem generis*, he agrees it is of the same type. No authority is cited in his brief at the top of the eighth unnumbered page thereof for the proposition: "When general and specific words are associated together, the general words should be restricted to a sense analogous to the less general terms," and he argued this extensively at the hearing. It seems to me that this is an application either of the rule of *ejusdem generis*, defined in *Black's Law Dictionary* "of the same kind, class, or nature" or the broader maxim, "*noscitur a sociis*," also defined in *Black's* as:

> It is known from its associates. . . The meaning of a word is or may be known from the accompanying words. . . . Under this rule general and specific words, capable of analogous meaning when associated together, take color from each other, so that general words are restricted to a sense analogous to less general.

In discussing the definition of *ejusdem generis*, *Black's* further states that:

> Where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.

However, *Black's* points out that the rule "does not apply when the context manifests a contrary intent," citing a number of cases.

In this instance, reading all of the Virginia Waste Management Act and recognizing its purpose to protect the public health, safety and welfare of the citizens of Virginia, coupled with the obvious danger to the public health, safety and welfare shown in this evidence, compels the conclusion that "stump dumps" are covered both within the statute and the regulation as "commercial waste."

While an argument could be made that the rule of *ejusdem generis* and *noscitur a sociis* could be applied to these definitions, a careful reading of all these definitions indicates a contrary intent even within the language of the contested phrases. The statute itself refers to commercial operations and the rule defines commercial operations by listing certain kinds of commercial activities of which admittedly construction and land clearing are not specifically included, *but* the definition of commercial activity in the regulations is careful to say that the inclusion of specific operations is not to be taken as a limiting factor in the definition, thereby expressly evidencing an intent not to have that rule applied. Certainly these tree stumps and limbs do emanate from "establishments engaged in business" within the definition of commercial waste in the regulation and in the statute.

Accordingly the Court will enter a permanent injunction in this case.

Counsel have requested a further hearing to define the terms of the injunction to protect the landowner should he later be able to qualify his quarry as an approved "stump dump." The Court will be glad to hear suggestions from counsel by letter or in a telephonic or personal hearing as to the language.